FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 APR 27 PM 2:31

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

LOUISIANA ENVIRONMENTAL ACTION         CIVIL ACTION
NETWORK and CITIZENS FOR A STRONG
NEW ORLEANS EAST

v.                                       NO. 06-2020

U.S. ARMY CORPS OF ENGINEERS            SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court is the plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. For the reasons that follow, the motion is DENIED.

## **Background**

This dispute confronts still another chapter in the havoc and tragedy of Hurricane Katrina.

Louisiana Environmental Action Network and Citizens for a Strong New Orleans East sue for declaratory and injunctive relief against the Army Corps of Engineers seeking to stop the Corps' issuance of an emergency permit to Waste Management of Louisiana for the purpose of dumping hurricane construction and demolition debris at 16600 Chef Menteur Highway -- a site mostly comprised of navigable waters of the United States -- which is adjacent to the

1

Fee_____
Process_____
X Dktd_____
✓ CtRmDep_____
Doc. No_____

Bayou Sauvage National Wildlife Refuge and near a Vietnamese community of many thousands in New Orleans East. Plaintiffs complain about the lack of public notice and an opportunity to comment, and they question whether emergency status exists.

In February 2006, Waste Management of Louisiana submitted an "Emergency Disaster Cleanup Site Request" to the Louisiana Department of Environmental Quality for the Chef Menteur site.[1] Waste Management also applied for a Section 404 Clean Water Act permit from the Corps to excavate land and place fill material for the construction of the proposed landfill. Since then, on April 13, the LDEQ waived the Clean Water Act's requirement for a water quality certification from Louisiana for the site as a condition to "performing such work needed to abate the present emergency that will result in discharges into navigable waters[.]" LDEQ acknowledged "the immediate need to dispose of debris resulting from storm damage and subsequent demolition of buildings."[2] The

---

[1] Also in February, New Orleans Mayor Ray Nagin signed an Executive Order suspending the Orleans Parish zoning ordinance for the site. According to plaintiffs, on April 6, 2006, residents of the community protested the emergency suspension of laws for this site and, that same day, the City Council unanimously voted to ask the mayor to rescind the emergency suspension of zoning laws for the site.

[2] The LDEQ's April 13, 2006 letter to Waste Management further provides:

> The intent of this letter is to allow the applicant to commence activities described in the 404 permit application, not to release

2

emergency-status administrative process model was triggered.

On April 14, 2006, the Corps acknowledged its receipt of Waste Managment's application to construct a construction and demolition debris landfill at 16600 Chef Menteur Highway and advised Waste Management of its emergency authorization:

> By this letter, we are granting you emergency authorization to commence operation of the landfill while we continue to evaluate your Department of the Army permit application. This authorization allows the disposal of construction and demolition debris, and vegetative debris resulting from Hurricanes Katrina and Rita. All disposal operations must be consistent with the emergency authorization issued by LA DEQ in [sic] letter dated April 13, 2006.
>
> This emergency authorization does not obviate the need to obtain other Federal, State, or local authorizations required by law. To the maximum extent practicable, the performance of this work should be done in a manner that will minimize adverse impacts on the environment.

Plaintiffs have learned that trucks have begun hauling waste to the site as of Thursday, April 20, 2006. But whether actual dumping has taken place has not been established.

---

the applicant from any requirement to obtain a Section 401 Water Quality Certification after-the-fact.... To the extent practicable, the performance of the work which is the subject of this waiver should be done in a manner that will minimize potential adverse impacts on water quality.

3

Plaintiffs seek a temporary restraining order and preliminary injunction, charging that the Corps has issued an emergency permit without compliance with federal law. Specifically, plaintiffs urge that issuing an emergency permit without (i) public notice, (ii) the opportunity to comment, and (iii) an analysis of the need for an emergency permit violates Section 404 of the Clean Water Act, 33 U.S.C. § 1344 and the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C).

The Corps represents that it will issue a draft permit for this facility for public notice and comment shortly, possibly as early as within a week. And the Corps points to the emergency environment that drives this dispute, as justification for its actions to date.

I.

A.  Standards for Injunctive Relief

Injunctive relief "'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.'" Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex., 905 F.2d 63, 65 (5th Cir. 1990) (quotation omitted); see also PCI Transport., Inc. v. Ft. Worth & Western R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005). A temporary restraining order or preliminary injunction may be granted only if plaintiffs show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant

4

will suffer irreparable injury if the injunctive relief is denied;
(3) the threatened injury to the movant outweighs the harm the
injunction will cause the opponent; and (4) the injunctive relief
will not disserve the public interest. See Lakedreams v. Taylor,
932 F.2d 1103, 1107 (5th Cir. 1991).

    B.  The National Environmental Policy Act

    The purpose of the National Environmental Policy Act, 42
U.S.C. § 4321, is to focus the attention of the federal government
and the public on a proposed action, such as the issuance of a
Section 404 Clean Water Act permit, so that the consequences of
governmental action can be studied before the action is implemented
and potential negative environmental impacts can be avoided. See
Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989).
Regulations at 40 C.F.R. §§ 1500-1508 provide guidance on NEPA's
application. Robertson v. Methow Valley Citizens Council, 490 U.S.
332 (1989). The NEPA process usually requires public notice and
public involvement.

    But the Corps also has authority under an emergency regulation
that creates different procedures when there is "imminent risk of
life, health, property or severe economic losses." 33 C.F.R. §
230.8. Completion of emergency work pursuant to emergency status
requires NEPA documentation and consideration of probable
environmental consequences prior to initiation of emergency work if
time constraints permit, but "[s]uch documentation may also be

accomplished after the completion of emergency work, if appropriate." Id. Thus, some emergency must exist, as contemplated by the instruction of the regulation, to validate a temporary suspension of the public notice and comment requirement of NEPA.

A NEPA challenge is brought pursuant to the Administrative Procedure Act. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882-83 (1990). The federal courts are not authorized to consider substantive results; we consider the propriety of the process. "[T]he NEPA statutory framework provides no substantive guarantees[,]" the Fifth Circuit stresses, "it prescribes adherence to a particular process, not the production of a particular result." Spiller v. White, 352 F.3d 235, 238 (5th Cir. 2003) (citation omitted). Thus, NEPA's requirement for federal agencies, and this Court's inquiry, is procedural: agencies must consider the environmental impact of any federal agency decision, and they must prepare Environmental Impact Statements for all "'major federal actions significantly [affecting] the quality of the human environment.'" Id. at 237 (quoting 43 U.S.C. § 4332(2)(C)). This Court's review is, therefore, rather confined, as will be discussed in detail later. An agency's NEPA-related decision is accorded significant judicial deference and must be upheld unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

Spiller instructs that the reviewing court "has the 'least latitude in finding grounds for reversal' of an agency decision and 'may not substitute its judgment for that of the agency.'"  352 F.3d at 240 (quotation omitted).[3]

C.  The Clean Water Act

The Clean Water Act (CWA) prohibits the discharge of dredged and fill materials into navigable waters, including wetlands, without a permit.  33 U.S.C. §§ 1311, 1362.  Section 404 of the CWA authorizes the Corps to issue permits for the discharge of dredged and fill materials into navigable waters.  Id. at § 1344.  Before the Corps may issue such a permit, the permit applicant must provide the Corps with "a certificate from the state in which the discharge originates or will originate...that any such discharge will comply with" applicable provisions of the statute.  Id. at § 1341(a)(1).  Further, the state is required to "establish procedures for public notice" as part of the process; if the state "fails or refuses to act on a request for certification, within a reasonable period (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application."  Id. And, no permit may be granted until the requisite certification has been granted, or waived; of course, no certification may issue if

---

[3] No community can be expected to want a landfill nearby. But the Court does not have the luxury of substituting its view simply to be faithful to that understandable sentiment.

7

the state denies the certification request.   Id.

The Corps is required to consider the impact of the issuance of a Section 404 permit on the public interest.   33 C.F.R. § 320(a).   The Corps' regulations also require that the public receive notice and the opportunity to comment on Section 404 permits.   33 C.F.R. § 325.3.   Again, however, in emergency situations, special processing procedures apply, and what is an emergency is carefully defined:

> Emergency procedures.
> Division engineers are authorized to approve special processing procedures in emergency situations.   An "emergency" is a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures....   Even in an emergency situation, reasonable efforts will be made to receive comments from interested Federal, state, and local agencies and the affected public.   Also, notice of any special procedures authorized and their rationale is to be appropriately published as soon as practicable.   33 C.F.R. § 325.2(e)(4).

D.  Standard of Review:  the Administrative Procedure Act

Plaintiffs' NEPA and CWA challenge is governed by the Administrative Procedure Act's deferential "arbitrary and capricious" standard of review.   See 5 U.S.C. § 706.   The Court may not substitute its judgment for that of the Corps.   Rather, it must conduct a review of the entire record to determine whether "the

8

decision was based on the relevant factors and whether there has been a clear error of judgment." <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 416 (1971), <u>abrogated in part on other grounds by</u> <u>Califano v. Sanders</u>, 430 U.S. 99 (1977).  This record and the evidence do not establish clear error.

II.

The Court finds that plaintiffs have failed to carry their burden to show a substantial likelihood of succeeding on the merits of their CWA or NEPA claims.  <u>See</u> <u>PCI Transport., Inc. v. Ft. Worth & Western R.R. Co.</u>, 418 F.3d 535, 545 (5th Cir. 2005); <u>Hayne Blvd. Camps Preservation Assoc.</u>, 143 F. Supp. 2d 628, 633 (E.D. La. 2001).

As to the CWA claim, the plaintiffs contend that the Corps issued an emergency authorization to Waste Management without a finding that the situation qualified as an emergency as defined by the Corps' regulations, and, therefore, without the requisite notice and comment.  The Corps responds that its decision to issue emergency authorization to Waste Management was accomplished pursuant to the terms of its General Permit and the Corps' own regulations.

The Court finds that the Corps did make a finding under its governing regulations that the clean-up in the wake of Hurricane Katrina qualified as an emergency.  <u>See</u> 33 C.F.R. § 324.2(e)(4). The Corps correctly insists that it properly granted temporary

9

emergency authorization, given: (1) the adverse environmental health concerns presented by the current state of Hurricane Katrina debris and the upcoming demolition operations; (2) the economic hardship and logistical problems that would result if construction and demolition debris had to be sent to other landfills; (3) the impact to the environment would be minimal due to lack of hydrological connection, no vegetation present, and no wetlands present at the site; and (4) the feasibility of restoring the site if the emergency permit is revoked.[4]

The Court finds that the plaintiffs have failed to show that they would be likely to succeed on the merits; they have not shown how the Corps' temporary emergency authorization (which itself is explicitly narrowly tailored to meet its emergency purpose),[5] in light of the record and articulated state of emergency, is arbitrary and capricious.

As to the plaintiffs' NEPA claim, the Court again finds that the plaintiffs have not shown a likelihood of succeeding on the

---

[4] The government established the hazards and community safety concerns about the use of other existing landfill sites. Moreover, the plaintiffs' evidence failed to establish the fact or likelihood of leaching at the proposed site.

[5] As noted elsewhere, the General Permit says the scope of the temporary emergency work must be evaluated proportionally to the impact on the environment and does not obviate the normal permitting approval required. Moreover, the Corps continues to evaluate Waste Management's Section 404 application and intends to put a draft permit out for public comment as early as within a week.

merits.  The plaintiffs have not shown that the Corps' emergency authorization was an arbitrary and capricious act.[6]

The Corps issued its emergency authorization pursuant to its General Permit for Emergency Authorizations within the New Orleans District.  That permit was issued pursuant to the Corps' regulations at 33 C.F.R. § 325.8(b).  Moreover, all General Permits must comply with NEPA and therefore undergo public notice and comment, as well as NEPA analysis, when they are issued.  This General Permit, issued in 1982 and set to expire in 2007, authorizes the minimum amount of work necessary for the New Orleans District of the Corps to respond to emergencies "which would result in imminent safety and/or environmental hazard, loss of property, or immediate economic hardship."  That seems vital to the mission of the Corps; it is a helpful weapon against a paralyzing bureaucracy.

The General Permit does not replace normal permitting approval; it merely allows for temporary approval to allow a permit applicant to perform the inevitable preliminary work imperative in emergency situations.  The applicant here, Waste Management, must still apply for a permit (which it is in the process of doing) or restore the site to its pre-project condition.  If the Corps

---

[6] As noted, NEPA provides no substantive guarantees.  Nor does it command the environmentally-preferable course of action; it merely prohibits uninformed, rather than unwise, action.  Spiller, 352 F.3d at 240.

11

ultimately denies the Section 404 permit, or revokes the temporary emergency permit, Waste Management must immediately restore the site to its pre-project condition.

The Corps contends that it issued the emergency authorization to Waste Management based on the findings by the City of New Orleans and the State of Louisiana Department of Environmental Quality, the state agency charged with environmental protection. LDEQ found that "Louisiana is in a state of emergency as a result of the widespread damage caused by Hurricane Katrina and Rita" and that "the hurricanes created conditions requiring immediate action to prevent irreparable damage to the environment and serious threats to life or safety." One need only look around to know the tragic truth of these statements and findings.

Moreover, the Corps is at this moment considering Waste Management's application for a permit and, as a part of this process, the Corps represents that it plans to issue a public notice on this application within the next several days. Accordingly, the environmental analysis that the law mandates is imminent and should take place shortly after the temporary emergency authorization that is in place. Although it seems clear the removal work should have begun months ago, no reasonable person could argue that an emergency does not nevertheless exist.

Accordingly, the plaintiffs have not shown a substantial likelihood that they will succeed on the merits of their CWA or

NEPA claims.   For this reason alone, injunctive relief is inappropriate.

III.

The plaintiffs have also failed to satisfy their burden of proving they will suffer irreparable harm as a result of the Corps' emergency authorization.   The perceived claim of harm to LEAN is that resulting from the release of pollutants from the materials to be placed at the site.   However, the plaintiffs' concern regarding polluting the environment and waters seems speculative; they fail to show how their perception of harm is not addressed by the practice of safety measures and the restriction as to the type of debris that will be deposited there -- the landfill at Chef Menteur will only accept construction and demolition debris and vegetative matter.   The Corps points out that measures are in place at the site to ensure that only these categories of debris are allowed into the site.   Thus, the plaintiffs have not shown how the leaching of dangerous materials is anchored to the facts of record.

More importantly, any perceived harm resulting from plaintiffs not being permitted to participate by notice and comment on the emergency authorization is hardly irreparable.   As noted, the Corps is considering Waste Management's permit application and will be releasing a draft permit for public notice and comment soon.   That the permitting process is ongoing extinguishes any real harm suffered by the plaintiffs because:   (1) the process requires the

13

Corps to undertake a rigorous environmental analysis to assess the potential risks to the environment, thus reasonably ensuring consideration by the Corps of the exact environmental harms alleged by plaintiffs; and (2) the permitting process will provide the plaintiffs with notice of the permit, of the Corps' specific plans for the site, of the opportunity to comment on these plans, and of the opportunity to challenge the Corps' final decision. Thus, although emergency status has been determined for the work thus far, plaintiffs have not been deprived of their procedural rights for public notice and the opportunity to comment; rather, they will have the opportunity to avail themselves of those rights during the draft permit process.

IV.

Finally, the Court finds that the plaintiffs have failed to show that injunctive relief would not disserve the public interest. The plaintiffs contend that, without injunctive relief, protection of water resources and "assuring that federal agencies make informed permitting decisions" will be compromised. The Court disagrees. The plaintiffs have failed to show how injunctive relief will facilitate an informed decision by the Corps regarding processing Waste Management's permit. That process is underway.[7]

---

[7] Plaintiffs point to a document that deals with a Gentilly landfill and simply remarks that "bagged asbestos noted" with no other comment by the state Department of Environmental Quality. That evidence falls woefully short of establishing the harm plaintiffs are only able to speculate about. Their evidence

14

Denial of injunctive relief at this stage does not alter the status quo: the Corps will continue processing Waste Management's permit application, including public notice and an opportunity for public comment, and the 16600 site will continue to be accessible to Waste Management, subject to the limitations imposed by the General Permit (including a requirement to narrowly tailor any work to that which is necessary to respond to the emergency and to restore the site to its pre-project form if denied a 404 permit). The Corps has not yet abused the administrative process mandated by law. It has thus far complied.[8]

---

frames their beliefs, not facts. Plaintiffs further rely on Dr. Reith's testimony lauding alternatives to waste disposal and demolition, such as recycling and deconstruction, as cost-effective and available alternatives. The Court notes that Dr. Reith's testimony was evasive and his credibility diminished by his advocacy of concededly unproven theories. Moreover, in any event, all of this information concerning alternative methods of disposal and environmental impacts will be addressed imminently during the public comment period when the Corps releases the draft Section 404 permit for the 16600 site. At that time, a thorough evaluation of the precise environmental impact should and will occur. At this time, however, the plaintiffs have not shown that the Corps has acted arbitrarily in issuing a temporary emergency authorization (together with its limitations and restoration requirements) for the 16600 site.

[8] The Court emphasizes that it is restrained in its review of agency action; thus, it is not the Court's place to comment on the equities involved in the Corps' decision to authorize, pursuant to regulatory emergency procedures, a landfill located near any particular community or wildlife refuge. Without question, there is much debate to be had about these sensitive issues. However, as the Supreme Court has noted in the context of the environmental impact of nuclear generation facilities and licensing determinations, those decisions are left up to Congress and the agencies to which Congress has delegated its authority:

Accordingly, the plaintiffs' motion for injunctive relief is DENIED.

New Orleans, Louisiana, April 27, 2006.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

Much of the debate focuses on whether development of nuclear generation facilities should proceed in the face of uncertainties about their long-term effects on the environment. Resolution of these fundamental policy questions lies, however, with Congress and the agencies to which Congress has delegated authority, as well as with state legislatures and, ultimately, the populace as a whole. Congress has assigned the courts only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with the controlling statutes....

Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, et al., 462 U.S. 87, 97 (1983).

16